No. 2740.

Jack McDade *v*. The State.

27 641
33 537
27 641
f35 607

1. MURDER—MANSLAUGHTER—CHARGE OF THE COURT.—The proof shows that about one month before the homicide involved in this prosecution, the deceased killed one C., a relative of the defendant, and that the said killing resulted in creating relations of open and avowed enmity between the defendant and one S. on the one side, and the deceased on the other; that these relations became so strained and dangerous that mutual friends finally intervened and induced the parties to agree, on the part of defendant and S., not to molest the deceased, and on the part of deceased that, in visiting Hempstead, he would only carry his Winchester rifle in his buggy, or, if on horseback, in the scabbard to the saddle, and that any other mode of carrying the said gun was to be construed by defendant and S. as a declaration of hos-

tility by deceased; and that threats uttered by either party were by
the mutual friends to be reported to the other party. The proof fur-
ther shows divers breaches by the deceased of the agreement as to the
carrying of the gun, and frequent threats of a deadly nature uttered
by deceased, some of which were communicated to the defendant and
S. The inculpatory proof shows that, when shot, the deceased was
sitting on his horse, with his gun across his lap, and his back toward
the place from whence he was shot, and that, so far as was apparent,
he was unconscious of the proximity of any person save those to whom
he was talking, that he fired no shot, and that he made no motion to
seize his gun, at least until immediately before he was fired upon, when
he was warned by a bystander to "look out;" that a few minutes prior
to the shooting the defendant and S., from a short distance, remarked
deceased's presence, and immediately, by a circuitous route, and
through an alleyway, approached to within a few feet of the deceased,
and opened fire upon him from behind him, with fatal effect, and con-
tinued to shoot him while in the death agony. The defendant pro-
duced testimony to the effect that he and S. went to the place of the
killing in the manner they did to execute a warrant for the arrest of a
desperate criminal, who was reported to them to be at that place, and
that their coming upon the deceased was sudden and wholly unex-
pected. Upon this state of proof the defendant claims that, by reason
of the recent threats and acts of the deceased, in violation of the agree-
ment, and their sudden and unexpected discovery of him with his gun
carried contrary to the agreement, they were confronted with such
appearance of danger as was calculated to arouse, in men of ordinary
temper, such emotions as would render the mind incapable of cool re-
flection; and upon this theory he demanded of the court the submis-
sion to the jury of the issue of manslaughter. *Held* that the proof did
not present, and the trial court did not err in refusing to submit to
the jury the issue of manslaughter, because the evidence does not es-
tablish "adequate cause," nor show any purpose on the part of the
deceased, when killed, to execute threats previously made by him.

2. SAME—SELF DEFENSE.—See the statement of the case for a charge of
the court on the issue of self defense, *held* sufficient under the evidence
adduced; and see the opinion for requested instructions on the same
question *held* to have been properly refused as unwarranted by any
proof in the case.

3. SAME—REASONABLE DOUBT.—Upon the doctrine of "reasonable doubt"
the trial court charged the jury as follows: "The defendant is pre-
sumed to be innocent until his guilt is established by the evidence to
the satisfaction of the jury beyond a reasonable doubt"—omitting the
statutory word "legal" before the word "evidence." *Held*, that the
omission was immaterial, and the instruction in substantial compli-
ance with the statute.

4. SAME—EVIDENCE.—In the examination of his own witness the defend-
ant proved the declaration of deceased to the said witness, that de-
fendant had uttered threats against him, deceased. Defendant re-
quested the court to charge the jury that such declaration of the de-

ceased could not be considered by them as evidence that such threats were made by the defendant. *Held* that, having himself elicited the adverse testimony, the defendant could not he heard to complain, and the court did not err in refusing the instruction.

5. Murder—Fact Case.—See the statement of the case for evidence *held* sufficient to support a conviction for murder in the second degree.

Appeal from the Criminal District Court of Harris, on change of venue from Waller. Tried below before the Hon. C. L. Cleveland.

This conviction was in the second degree for the murder of S. W. Allchin, in Waller county, Texas, on the twelfth day of May, 1888. The penalty assessed against the appellant was a term of eight years in the penitentiary.

William Cameron was the first witness for the State. He testified that he lived in Waller county, Texas, about seven miles east of the town of Hempstead. He was in Hempstead on the morning of May 19, 1888, and witnessed the killing of Allchin by the defendant and Dick Springfield. It occurred between ten and eleven o'clock on that morning. At the time that the first shot was fired the witness was standing in front of the south door of Fritz Zeisner's saloon. At that time Haveman & Co. occupied the south corner store of the block. Zeisner occupied the next building north. Pointer's store was the building north of Zeisner's, and Cole's drug establishment was the next. The next store was Keiser's; the next was Schwartz's, and the next was the north corner of the block, into which Haveman & Co. had removed since the homicide. The south corner of that block is the corner hereafter referred to as Haveman's corner. While standing at Zeisner's south door, as stated, talking to Mr. Joe Nast, the witness heard the report of a gun fired from a point near him. Looking in the direction whence the report came. the witness saw Dick Springfield with a shot gun in his hands, standing near the southeast extreme of Haveman's corner. Turning to his left, the witness saw Allchin, sitting on his horse, about eight feet distant from where witness was standing. Allchin had been shot in the arm and in the left side behind the arm. He was then leaning his body slightly forward on his horse, holding a bridle rein in each hand and kicking his horse. His Winchester rifle was across his saddle between his body and the pommel of the saddle. The first step or two of the horse caused Allchin to slacken his

grip on the bridle, when the horse wheeled to run. About that time Springfield fired again, and when the horse had taken twenty or twenty-five steps the defendant fired with his shot gun, and Allchin fell off of his horse on the right hand side, his gun falling partially under him and to his left. Springfield and defendant then ran to the body, when Springfield fired three shots into it with a pistol, and defendant three other shots with a pistol and one with a shot gun.

After firing the seven shots as stated into the prostrate body of Allchin, the defendant and Springfield reloaded their shot guns, which were breech loaders, and walked west, twenty or twenty-five feet to the pavement. Upon reaching the pavement defendant pointed to several parties standing in front of Pointer's store, and said: "All those men" or "all those sons of bitches ought to be killed." The witness went to Allchin as soon as defendant and Springfield left him, remained but a moment, and then went to a point on the street about opposite Keiser's store. By that time defendant and Springfield reached the north corner of the block, where they met defendant's uncle, Sheriff Thomas S. McDade. Defendant exclaimed to Captain McDade: "Uncle Tom, we got him." Witness then turned and went back to Allchin, who had ceased to breathe since witness left him a minute or two before. Quite a crowd had now collected about the body. Bob Pointer, who was very much excited exclaimed: "Here lies his gun," and took hold of it but dropped it when advised by somebody present not to handle it. The said gun, which witness then observed, was in the condition in which Allchin usually carried it. After falling off his horse Allchin raised his head as high from the ground as he could raise it without moving his body. The body had been turned over when the witness went to it the second time, and witness for the first time saw that the face had been shot off from the chin to the eye brows. He lived not exceeding five minutes after he was shot. The witness and Allchin were about eight feet apart when the shooting began, Allchin sitting on his horse, which faced a little north of west, and thus placed him to the left of witness. The street extended north and south. Witness had just stepped away from Allchin when the first shot was fired, and at that particular time was talking to Joe Nast. The witness was standing on the sidewalk, and Allchin's horse was as near to the sidewalk as he could get, and was standing still. Defendant and Springfield, when witness

first saw them, were a little southwest from Allchin, Spring-field five, six or seven feet north from the corner of Haveman's store, and the defendant three or four feet north from that corner. They were standing about thirty-five feet distant from Allchin. They were "to the side of Allchin and a little back of him." The witness did not see the defendant until the first shot was fired. The first three shots were fired from shot guns, two of them by Springfield and the other by defendant. The other shots, except one fired by defendant into Allchin's body after it had fallen, were fired from pistols in the hands of defendant and Springfield.

Continuing, the witness said that the first shot was fired within three minutes after he spoke to Allchin, and had stepped off and joined Joe Nast. When the witness spoke to Allchin, the latter had his Winchester gun across his saddle, the muzzle pointing a little southwest, and it was in that position immediately before the shooting. He was not facing the direction whence the shots were fired. His left side was towards defendant and Springfield when the first shot was fired, and his back was towards them when the second shot was fired, his hands still grasping his bridle reins. The witness could not see Allchin's hands after the second shot, but saw that he continued to lean forward until he fell. His gun was balanced across the saddle until it fell with him, off the horse, on the same side. The witness could and did see Allchin's face as he fell off his horse. It had not then been shot. After shooting into Allchin's prostrate body and reloading their shot guns, defendant and Springfield walked along the pavement to the north corner of the block, where they met Sheriff McDade. Witness saw no person other than Sheriff McDade with defendant and Springfied after the shooting. Springfield at that time, was a deputy sheriff under Sheriff McDade. Witness knew that defendant was a nephew of Sheriff McDade, but did not know that he was a deputy sheriff.

Cross examined, the witness said that it was generally reported and generally conceded that about a month or six weeks before his death, Allchin killed one Chambers, a son-in-law of Sheriff T. S. McDade, the uncle of this defendant. The killing of Chambers by Allchin was understood to have occurred in Waller county. Allchin had never talked to witness about the killing of Chambers. The witness knew nothing whatever about the existence of a political feud in Waller county at and

before the time of the killing of Allchin. He did not know, as a matter of fact, that defendant and Allchin were members of rival political clubs. He had heard of the existence in Waller county of two antagonistic parties, but was unable to say whether the nature of said parties was political or not. He had heard that the "parties" were at enmity with each other; that "they were on different sides, and took different positions," but he could not say whether this division was on private or public questions. Witness did not on the fatal morning, before the shooting, see Allchin at the railroad depot, and on the platform displaying his Winchester. The witness had no conversation with Allchin just before the shooting, but merely passed the usual salutation of a friend, and passed on to Zeisner's saloon, got a glass of beer, stepped out and was talking to Nast when the shooting occurred. Witness did not see the defendant and Springfield when they reached the point on the sidewalk from where they fired the fatal shots, but he could have seen them had he then been looking that way. Witness saw Springfield at the firing of the first shot, and he was then standing on the sidewalk about ten feet from the corner. He did not observe the defendant or the deceased immediately before the first shot was fired, and could not say what they were doing at that particular moment. Immediately after Springfield fired the first shot, witness looked and saw that he had shot Allchin through the arm and side. Witness plainly saw the bullet or buckshot holes in Allchin's coat. Allchin's horse had gone fifteen or twenty feet when defendant fired his first shot. The witness did not hear what reply, if any, Captain McDade made to defendant's exclamation: "Uncle Tom, we got him." The witness was not a member of any political club of which Allchin was a member. Witness had heard that Allchin had had a body guard, but he was not a member of that guard.

On re-examination the witness said that all he knew of the existence of Allchin's body guard was what he had heard as current rumor in the neighborhood. Chambers, the son-in-law of Sheriff McDade, who was killed by deceased about six weeks before the latter's death, was a deputy sheriff under Sheriff McDade. Deceased was a teamster by trade and held no official position at the time of his death. If he belonged to any club or other political organization, the witness was not aware of it. When witness's attention was first directed to defendant and

Springfield immediately before the shooting, they had their guns in a shooting position, defendant standing somewhat to the rear of Springfield.  Allchin did not raise or attempt to raise his gun from the time that Springfield fired the first shot until he fell off his horse.

The plat of that part of the town of Hempstead contiguous to the place of the homicide was put in evidence at a later stage of the trial, but for convenient reference it is here inserted.

Statement of the case.

C. D. Robinson was the next witness for the State. He tes-tified that he lived in the town of Hempstead, Waller county, and was engaged in the mercantile business. His store faced south and was about one hundred feet distant from the alley on which the corner of the Haveman store rested. While standing in his store door on the morning of May 19, 1888, the witness saw the defendant and Dick Springfield, each armed with a shot gun, step out of the side door of Wheeler's saloon into the alley. They went south from witness's store. About the time they could reach the place from which the fatal shots were fired, the witness heard the shooting, and soon saw All-chin's horse "run up." To get to that place the defendant had to go the width of a street and the length of a block. Leaving the saloon, defendant and Springfield went in a southwest direction until they struck the alley next to Haveman's corner, when they went south. "To bring them to the Haveman store they would have to go due east, and to bring them to Have-man's (corner?) they would have to go north." They walked rapidly and appeared to be in a hurry, carrying their guns at their sides. Witness heard the defendant cock his gun as he entered the alley. Witness next saw defendant and Springfield in the street between his, witness's, store and the Haveman block. That was about five minutes after the shooting. Spring-field exclaimed: "If there is any damned scoundrel who wants to take up the fight, come out in the street! Come on, boys, let's go over to Wheeler's and take a drink." Three or four parties were then with defendant and Springfield, but witness did not know who they were. Sheriff McDade soon afterwards joined the party.

Cross examined, the witness said that he did not see Allchin on the day of the homicide, either before or after he was killed The first time witness saw Allchin, to know him, was about a week before the killing, when he saw him passing on the street. Allchin, after that, came into the witness's store. Witness knew nothing about Allchin being on the platform at the rail-road depot on that morning, flourishing his Winchester. Wit-ness did not see defendant and Springfield after they passed into the alley, until a very few minutes after the shooting, they appeared on the street, and Springfield called on the "boys" to go to Wheeler's and get a drink. It was the opinion of the witness that the killing of Allchin was a result of the previous killing of Chambers. The community about Hempstead was a

---

---

peculiar one at the time of the killing of Chambers and Allchin. Since the killing of Allchin the witness had been elected justice of the peace, and the community was not now so peculiar. Witness anticipated trouble when he saw defendant and Springfield step out of Wheeler's saloon into the alley with their shot guns. After his election to the office of justice of the peace the witness held the inquest upon the body of T. S. McDade, who was sheriff of Waller county at the time of this homicide. T. S. McDade, and another member of the McDade party, were murdered in cold blood—assassinated at night The witness, at this point, was asked if it was not a matter of public notoriety that the killing of T. S. McDade, Louis Mc-Dade, a colored man, and Chambers, was a part of the same feud? He replied that he had never heard that the killing of Louis McDade was a part of that feud.

Re-examined, the witness said that Louis McDade was murdered after the killing of Allchin and just before the election in 1888. Chambers was killed by Allchin about a month or six weeks before he was killed. He was wounded by Chambers at the time he killed him, and when killed himself was at liberty on bail. The killing of Chambers, as the witness understood and believed, grew out of an article published in the Advance Guard newspaper. That article reflected very severely upon a recent grand jury of Waller county and upon the Waller county officials. The said officials very bitterly resented the said publication. Witness understood that Allchin proclaimed himself to be the author of that article. Witness did not hear politics mentioned in connection with the killing of Chambers. Witness knew of no political organization at the times of the several killings. He did not know how long it was after the killing of Chambers when Springfield was appointed deputy sheriff, but it was only a short time.

R. B. Pointer testified, for the State, that he lived in Waller county, Texas, and followed the business of merchandising in Hempstead, and farming in the country. He came to the store on the fatal morning and hitched his buggy and horse in front of Haveman's store. While leaning on his show case making out a bill against a negro, the witness heard a shot. Looking up instantly he saw Allchin's horse wheel and run from in front of Zeisner's store, with Allchin, bare headed, on his back. Another shot was fired and Allchin fell. A few minutes before the first shot was fired the witness saw Allchin sitting on his

horse in front of Zeisner's store, with one leg around the pommel of the saddle, and his Winchester across the saddle between his body and the pommel. He still had the gun in that position when the horse fled from Zeisner's store, and when he fell off. He made no attempt to raise his gun that witness saw, but witness did not observe him just before the first shot was fired. The distance between the point where witness was standing and that where Allchin was sitting on his horse when the shooting began, was between fifteen and twenty-five feet. Witness did not see who fired the first two shots, but after they were fired, and Allchin fell, witness went to his front door and saw defendant and Springfield step off Haveman's gallery, armed with shot guns. At that time Allchin was lying on the ground working his head from side to side. His face, which witness plainly saw, was then perfectly natural, but defendant and Springfield walked up to his body, and fired several shots into his head, and when witness next saw Allchin, a few minutes afterwards, his entire face was shot off. Defendant and Springfield fired into the body at the same time, but witness thought that Springfield shot the face off with a shot gun. Defendant had a pistol as well as a shot gun, but witness saw no pistol in Springfield's hands. Immediately after discharging the shots into deceased's body, Springfield stepped to the sidewalk in front of Armstrong's drug store, and exclaimed: "This is the way we treat men who murder men on the streets." Defendant then said: "There are some other sons-of-bitches down this way that ought to be murdered." The parties thus referred to were parties then in witness's store. John and Jo Peebles, Dick Kimball and Bozeman then stayed in witness's store. The witness knew the defendant very well, but had only a slight acquaintance with Dick Springfield. About the time defendant made the above remark, he walked on up the street, and the witness re-entered his store. He remained in his store but a minute, and then went to Allchin's body. Allchin was then lying with his face to the ground, and was breathing his last breaths. Phil Duer told witness to turn the body over, which the witness did. The witness then picked up Allchin's Winchester, which was lying on the ground with the butt near Allchin's feet. The slide of the gun was pushed back, and there was sand in the slide at the place where the "plunger" works. Witness examined the gun and put it back where he got it. The lever was up about an inch. It was an old gun with a loose

guard.  At the very moment the first shot was fired the witness looked up from his show case and caught sight of Allchin, his horse then being in the act of wheeling.  Witness could not tell the position in which Allchin had his hands at that very moment.  The witness did not see the first two shots fired, and did not know, of his own knowledge, from what point they were fired.  It looked to him like the other shots were fired at Allchin's back as his horse ran off.

Cross examined, the witness said that he thought it was the left leg that Allchin had around the pommel of the saddle, when he observed him just before the shooting, but he was not absolutely certain that it was not the right leg.  Witness did not see the deceased on the depot platform that day, nor did he see him come to town from the depot.  He did not know how long deceased had been in front of Zeisner's saloon when he was shot.  Witness did not, prior to the shooting, see a man on the corner at Haveman's store whom he did not know.  He saw a well dressed stranger on that corner about twenty minutes after the shooting.  Witness took that man to be a drummer who had been soliciting trade from Haveman.  That man was not Claude Loraine.  Drays, carts, etc.,.traversed the alley next to Haveman's corner, but witness knew nothing about the character of that alley—whether a public or private thoroughfare.  The distance between the railroad depot and Haveman's store was between one hundred and twenty and one hundred and fifty yards.  The witness's store was next to Zeisner's, but witness did not go into Zeisner's on that day, nor did he know whether or not there were any guns in Zeisner's place on that day.  Witness could not say how long it was before the first shot was fired that he last saw the deceased, but it was not longer than a minute and a half.  He then had his leg across the pommel of the saddle.  Witness did not know when the deceased took his leg from around the pommel of the saddle.  When witness saw Springfield and defendant advancing upon deceased, Springfield was one or two feet in advance of defendant.  Springfield, when he reached the body, fired into the head with a shot gun.  Witness was quite positive that it was Springfield and not defendant who emptied the shot gun into Allchin's head after he had fallen.  It was the opinion of the witness that Allchin received the fatal wound when he fell from his horse, which was at a point in the street near the front of Zeisner's south door.  Witness did not notice but one man ·

on the street when he started to the body after the shoot-
ing, but there might have been as many as a hundred men on
the street at that time. A large crowd was present when wit-
ness turned Allchin's body over. Phil Duer was with defend-
ant when witness first stepped into the street after the shoot-
ing. As defendant and Duer started up the street the witness
stepped into his store. He stepped out again almost immedi-
ately, was joined by Phil Duer, and the two went together to
Allchin's body.

Further cross examined, the witness said he knew nothing of
an agreement to which Allchin was a party, and which bound
him not to carry his Winchester gun on the street. He did not
know whether or not Allchin was an expert in the use of a
Winchester gun. He had known Allchin for eight or nine
years, and during the last seven or eight months of Allchin's
life had never seen Allchin without his Winchester. He had
no recollection of ever seeing deceased carry a gun prior to the
time alluded to, seven or eight months before his death. The
witness did not belong to any political club or organization
which, at that or any other time, was on what was termed the
"Steve Allchin side of politics." Witness had never heard of
such a club or political organization until, soon after the kill-
ing of Allchin, he was attached as a witness for defendant and
Springfield. Claude Loraine then told witness about such an
organization, and witness had never heard anything more
about it. Witness knew, at the time of the killing, that for
some days or weeks Allchin had harbored in his house a body
of six or eight men who were said to constitute a "body guard"
for the said Allchin. He knew also of public or political meet-
ings that were held during the three or four months preceding
the election of 1888, and that Zeisner's place was the headquar-
ters of that faction, but he never attended any of those meet-
ings, and knew nothing about them, except that they were
held. The trouble which culminated in the Allchin and other
killings grew out of an article that was published in a newspa-
per reflecting severely on the "court house" officials. Witness
was not in Hempstead when the first of this series of killings
occurred, and it was by mere chance that he came to town on
the day that Allchin was killed. He did not know that the
purpose of the political meetings arranged or held at Zeisner's
was to organize for the defeat of Captain T. S. McDade, who
was then running for re-election as sheriff. Witness knew

Captain T. S. McDade well, and knew him as a good citizen, kind hearted and generous, and as quiet, peaceable and law abiding a man as lived in Waller county, or any other county in Texas. Captain T. S. McDade was assassinated, in the night time, six or seven months after the killing of Allchin, and it was not known who murdered him. Allchin had on a black coat when shot, and the witness was satisfied that he saw the shot strike him; at all events, he witnessed the sudden appearance of white spots on the coat immediately upon the firing of one of the shots. The sidewalks in front of Haveman's block, and along the line of that street, were constructed of plank. A man walking along them would not necessarily make a noise. Witness did not know that defendant and Springfield approached Allchin on the sidewalk.

On re-examination the witness said that Captain McDade had been sheriff of Waller county, at the time of the Allchin killing, for eight or ten years. He was nominated for re-election in 1888 on the Republican ticket, but withdrew from the race, and finally resigned the office before the election. Witness did not hear of the rival political organizations until October, 1888. He did not remember whether Captain McDade had then resigned the sheriff's office, nor did he remember whether, at that time, Captain McDade was running as the Republican nominee or whether Mr. Faulkner had been substituted. The race for that office was finally made by Mr. Faulkner as the nominee of the Republican party, and Captain Allsburn as the nominee of the "People's" party. The witness knew nothing whatever about the organization of the two political factions or parties. The witness did not know who defendant referred to when, just after the shooting of Allchin, he pointed towards witness's store and said that "there are other sons-of-bitches who ought to be murdered." It was possible that he referred to witness for one. Witness's brother-in-law, Mr. Peebles, was then an announced candidate for sheriff of Waller county. Allchin owned and "run" teams as a business. At that time his teams were at work at a point between two and four miles northwest from Hempstead. He lived about a quarter of a mile south from Hempstead. The parties who stayed about Allchin's house were his teamsters.

On his re-cross examination the witness said that he did not know whether Christy Williams, Floyd and Davidson, or either of them, were in the employ of deceased, just before his death,

as teamsters. He had never seen either of those parties about deceased's place. Witness had reason to believe or know that defendant, at the time Allchin was killed, wanted to hurt Jo Peebles, a brother-in-law of witness, and a candidate for sheriff. It was the public understanding that Captain McDade resigned his position as sheriff in response to a petition, and for the purpose of harmonizing conflicting elements. Jo Peebles was a withess for Allchin in his pending trial for the killing of Chambers, and he, Peebles, had told witness that, in killing Chambers, Allchin acted in self defense. Allchin was himself wounded in the fight with Chambers.

Dr. L. W. Groce, testifying for the State, described the twenty-seven wounds he found on the body of the deceased, and declared that of the said wounds those that penetrated the body in the region of the left kidney; those that penetrated the breast bone; the one that entered at the left eye, and those that passed out of the back of the head were necessarily mortal wounds. The face was horribly mutilated and almost entirely shot away. The said wounds were made by buck shot and bullets.

William Leary testified, for the State, that he lived in Waller county, Texas, about three and a half miles from Hempstead. He was in Hempstead on the morning of the fatal day, and imperfectly saw the killing of Allchin. When witness was driving past Fried's store, which was beween Armstrong's drug store and the place of the killing, he was hailed by a friend and stopped. While talking with his friend the shooting commenced, the parties doing the shooting being behind, and not within the view of witness at that time. He caught sight of Allchin just after his horse turned, and did not see the parties until after Allchin fell, when they came into the street. Both of those parties were strangers to witness, and witness could not now identify either one of them. He heard Allchin, after his body struck the ground, exclaim: "Don't shoot any more." The witness saw only one of the two parties shooting. Both parties had guns, and the one who did no shooting was a few feet behind the other. Witness was at the back of his wagon, ten or twelve steps distant from Allchin when the latter fell. When witness first observed Allchin, just before the shooting commenced, he was sitting on his horse in front of Zeisner's saloon, facing that saloon. He seemed to be holding the bridle reins with a strong grip. His side was then presented

to the witness. He was carrying his Winchester gun either across his lap or across his saddle, between his body and the pommel. Witness did not again observe the gun when it and the body fell from the horse together. As the witness thought himself within the range of the shots, he left his wagon without taking note of the number of shots fired. The witness did not hear any of the parties say anything before the shooting began, and if he heard anything said afterwards he did not now remember it.

Cross examined, the witness said that he was standing behind the wagon in the street when the first shot was fired, was standing there when Allchin passed him, and stood there until Allchin fell off his horse, when he ran into Fried's store. Allchin had struck the ground and was feebly moving his head when he exclaimed: "Don't shoot any more." The friend to whom witness was talking when the shooting commenced was W. B. Peebles. Witness's back was towards Allchin when the first shot was fired, and he was unable to say what Allchin was doing at that particular time.

Mrs. Brent Brown, wife of James Brown, testified, for the State, that she was in Hempstead on the fatal day and witnessed the killing of Allchin. She, her husband and sister-in-law went to Hempstead in a wagon. The wagon was stopped in front of Haveman's, and in front of and thirty or forty feet from Armstrong's drug store, into which drug store the witness's husband went. While sitting in the wagon waiting for her husband, witness observed Allchin talking to a gentleman whom she could not well see. Allchin was sitting on his horse, with his right hand on the pommel of the saddle and his left arm hanging down. He faced north with his right side presented to witness. His general appearance reminded witness of an acquaintance who lived in her neighborhood, and she remarked to her sister-in-law: "That man looks like Tom Wellingford." At that instant the first shot was fired, and Allchin turned to face the witness and her sister-in-law. The horse started off, the firing continued, and Allchin and his gun fell off the horse together. Witness did not see the parties who fired those shots, but saw that Allchin had nothing in his hands at the time the shots were fired. Witness heard at least two shots after Allchin fell. She saw two parties with guns after Allchin's fall, but saw none of the shots fired.

Mrs. Kate Wright testified, for the State, as follows: "I was

· at Mr. George Burton's house in Hempstead at the time Steve Allchin was killed. I was down stairs in his residence. I saw two men come out of the back alley behind Haveman's. They came out of the south end of the alley and went up the south side of the block, and then stepped on the side walk in front of Haveman's store. They had guns, and when I first saw them one of them had his gun on his shoulder. I saw them last when they stepped up on the side walk in front of Haveman's store. I then turned to call one of my cousins to come and tell me who they were. Just as I turned around I heard shooting and it sounded like it was around at Haveman's. It did not seem to me more than a second from the time they got on the side walk until the shooting commenced. Those men walked fast. I did not see them at the time of the shooting, nor I did not see Allchin. I was not in a position to see them at that time."

B. Scheuler testified, for the State, that just before the killing of Allchin, he had occasion to pass along the pavement in front of Wheeler's saloon, at the corner of which pavement he stopped. In going by the front door of that saloon, he passed the defendant and Springfield, who were standing on the pavement talking to a third party. Just as witness stopped at the end of the pavement he looked back and saw defendant and Springfield cross the street in a southwesterly direction towards the alley mentioned by previous witnesses, beyond which witness did not for a time see them. They walked fast and each of them had a double barreled shot gun. Witness went on his way, and when he reached I. Schwartz's corner, about three minutes later, he heard the shooting, and came within view of Allchin just as he fell off his horse. A few minutes later he heard defendant exclaim, as he passed Armstrong's drug store: "I reckon we got them this time!" His tone of voice was somewhat boisterous, and he appeared to address no person in particular.

Fritz Zeisner was the next witness for the State. He testified that he was the proprieter of a beer saloon and a grocery store at the time that Allchin was killed. He was inside of his said establishment, and from his position in there he saw Allchin when he fell from his horse. He did not see the firing of the first shots, but saw defendant and Dick Springfield when they fired into Allchin's body after he had fallen. Allchin, for a while before and at the time he was shot, was sitting on his

horse in front of the south door of witness's said saloon. He was facing the gallery, looking up and down the sidewalk a few moments before the shooting, and when the first shot was fired he was talking to Gus Miller and some other parties, and was shaking hands with somebody. He had his bridle reins in one hand, and a Winchester gun across his lap. He made no attempt to raise that gun either before, at or after the firing of the first shot. Immediately upon the firing of the first two shots Allchin's horse sprang forward, made two or three jumps, covering about fifteen feet, and Allchin and his gun fell off on the same side. Defendant and Springfield ran at once to the body and fired several shots into it. They ran to the body from around the south door of witness's store. Witness's said store was north of Haveman's store, and they came from the direction of Haveman's store. Both defendant and Springfield had a shot gun and pistol. As they came on the gallery, going to where Allchin was lying on the ground, witness thought they were coming into his store. He accordingly retreated, and heard nothing that was said by them or anybody else after the shooting.

On his cross examination, the witness said that if a gun and sixteen loaded shells were placed in his store on the fatal day by Christy Williams he, witness, did not know it. He saw no such gun or shells then or afterward. The killing of Chambers by Allchin occurred at the corner near witness's store. Witness saw it, and was then under process to attend Allchin's trial as a witness in his behalf, and it was because of that fact that he feared for his life at the hands of defendant and Springfield, and ran when he saw them coming toward his store on their way to where Allchin was lying in the street. The political club or organization that was opposing the re-election of Sheriff T. S. McDade had its headquarters and meeting place in the hall above the witness's store, but said organization got permission to use that hall from the hook and ladder fire company, which rented it from witness. The witness attended several of the meetings of that organization in that hall, and knew that Winchesters and six shooters were frequently carried into those meetings. The said organization met sometimes in the afternoon and sometimes at night. Witness denied that when Eli Browning came to him and said: "All the McDades should be killed," he replied: "Yes, and the women too." Christy Williams was in town on the fatal morning with a cart load of

flour, but he did not, nor did anybody else, take a shot gun into witness's store and leave it, or, if they did, the witness did not then nor now know that fact. Witness did not find a gun and cartridges in his store on that day, and he did not get a gun from there or anywhere else on that day and give it to any person. Allchin rode up to the front of witness's store, stopped and sent a negro into the store with some money to be changed. Witness changed it and sent the change back. In a very short time the shooting occurred,—before the party handed the change to him.

At this point witness was asked if he did not testify on the examining trial that Allchin was shot when the party was in the act of handing him the change. He replied that he did not see the negro hand Allchin any change, because the shooting began just as the negro stepped out of the store. The witness now states that Allchin's right hand was on the pommel of the saddle when the first shot was fired. His written statement on the examining trial represents him as testifying then that he did not know where Allchin's right hand was. Witness did not undertake to explain the conflict between his two said statements. It was either Nast or Miller, but witness was not positive which, that Allchin was talking to when the first shot was fired. The killing of Louis McDade occurred about twenty steps above the witness's place of business. Witness saw the said Louis four or five minutes before he was killed, but he did not see and did not know who killed him. Chambers was killed about one month before Allchin was killed, and witness was known to be a witness for Allchin with reference to that killing. and it was for that reason that, at the time of the killing of Allchin, he was afraid of guns in the hands of Springfield and the defendant. Witness denied that on the Monday after the killing of Allchin he told A. T. Bedell or anybody else that he was behind his counter and knew nothing more about the killing than that he heard the guns and saw Allchin fall off his horse. The political club which held its meetings in the hall above the witness's store was a club of the Democratic or People's party, in opposition to the Republican party. It was organized after the killing of Allchin, and for the campaign.

Gus Miller was the next witness for the State. He testified that he was in Hempstead on the fatal morning, and witnessed the killing of Allchin by the defendant and Springfield. Seeing Allchin on his horse in front of Zeisner's south door, the

witness stepped and shook hands with him, Allchin leaning forward and resting one hand on the pommel of his saddle. Having shaken hands, witness stepped back, or rather turned his body to face the same way Allchin was facing, which was north. About that time somebody exclaimed: "Look out!" Witness turned around and saw defendant and Springfield, armed with shot guns, on the gallery in front of Haveman's store, about six feet from the southeast corner. Witness stepped back quickly at about the moment two shots were fired. Allchin's body, when the person exclaimed "look out," was "quartering just a little back," and he was facing up the street, north. Witness could not say in which direction he, Allchin, was looking at the precise time the two shots were fired. He had his Winchester rifle across his lap between the pommel of the saddle and his body, and, when witness last observed him before the shooting, one of his hands was on the pommel. The first time witness looked at Allchin after the warning to "look out" was as the fourth shot was fired, when he, Allchin, fell off his horse. His gun fell with and partly under his body. Defendant and Springfield then walked to where he was lying and fired other shots into his body. Allchin at no time, either before or after the shooting commenced, raised or attempted to raise his gun so far as the witness saw. George Burton shook hands with Allchin just before the shooting.

Cross examined, the witness said that when he first saw and spoke to Allchin on that morning—which was just before the shooting—he, witness, had just come out of Haveman's store. Allchin was shaking hands with Cameron when witness joined him. He then shook hands with witness and then with Burton. As soon as he had shaken hands with Allchin, witness turned his face to look north up the street, and a few seconds later he stepped off a few feet, and was thinking about where he could find a purchaser for produce he had brought to town, when he heard the warning "look out!" Witness did not know where Fritz Zeisner was when the warning was spoken nor when the first shot was fired. Defendant and Springfield advanced upon Allchin after he fell, passing the witness on the side walk between the two doors of Zeisner's establishment. Zeisner came out of his store after defendant and Springfield had passed, and kept pulling at witness to leave until witness did leave. Witness did not know where Zeisner was when the first shot was fired.

Describing the occurrences immediately preceding the firing of the first shots, George Burton, a witness for the State, testified that he saw Allchin in front of Zeisner's saloon, on horseback, talking to either Nast, Cameron or Miller, all of whom were present. He was facing north or northwest, exposing his side to the south. Witness shook hands with him and stepped away. As witness started off he saw the defendant and Springfield on Haveman's pavement or sidewalk. One of them was aiming a gun and the other was raising a gun to his shoulder. Witness exclaimed "look out!" and sprang out of the way, when the firing began. He saw Allchin after he hallooed "look out!" and Allchin was then leaning forward on his horse, but witness could not say in what position his hands then were. He made no effort at any time, so far as witness saw, to raise his gun. Allchin's horse made two or three jumps after the first shots were fired, and Allchin fell off, when defendant and Springfield advanced upon him, and witness saw defendant fire one or two shots into the prostrate body. He did not hear either defendant or Allchin say anything after Allchin fell. Witness saw Springfield before the shooting at Wheeler's corner, and again between Jacobs's and Kaiser's places, going north. He was then alone and the witness thought had been down the Haveman block as far as Fried's, in search of and to arrest a man that Loggins was after. Springfield then had no gun. The shooting occurred fifteen or twenty minutes after the witness saw Springfield between Jacobs's and Kaiser's.

John Peebles, a clerk in Pointer's store, was the next witness for the State. His statement of the fatal transaction did not differ materially from that of Mr. Pointer, but he testified that Springfield reloaded his gun before advancing upon and firing into Allchin's body after the latter had fallen off the horse; and that, when he walked off from the body after the shooting was over, he, Springfield, exclaimed: "There he is, the damned murdering son-of a-bitch! I will show him how to murder men on the streets!" Wheeler's saloon was about one hundred yards from the front of Zeisner's saloon.

Thomas Whitman testified, for the State, that he lived in Brenham, Washington county. On the Monday or Tuesday before the killing of Allchin, the witness met defendant, then a total stranger to him, at the railroad depot, and asked him if the trouble in Hempstead was settled yet. Defendant replied: "No, it is not settled, and Allchin will bite the dust within two

weeks. Uncle Tom is willing to drop it and let the law take its course about the killing of Chambers, but Allchin is still toting his Winchester, and keeps seven or eight armed men—all strangers,—at his house. Probably others besides Allchin will be killed."

The material part of the testimony of the State's witness, T. Johnson, was that the Houston & Texas Central Railway freight depot was about two hundred yards distant from Zeisner's saloon and about three hundred yards distant from Wheeler's saloon. The platform at the said depot was elevated four or five feet above the ground. Allchin came to the said depot on the morning of the fatal day, bringing his Winchester with him. Witness asked him: "Steve, can you manipulate that thing well?" He replied: "Yes," and at the request of witness flourished it about his head, handling it with apparent ease. Witness then remarked to Allchin: "I am glad the trouble between you and Captain McDade has been settled." He replied: "Yes, that trouble has been adjusted. I will never bother the McDades if they never bother me." He did not explain to the witness the basis of the settlement, nor tell him of any agreement about the trouble to which he was a party.

C. C. Pye testified, for the State, that about fifteen or twenty minutes before the shooting of Allchin occurred he, witness, went from the post office to Wheeler's saloon to get a drink. He got his drink, and as he passed out of the saloon he saw defendant and Springfield standing on the southeast corner of the sidewalk, in front of Wheeler's said saloon, and heard one of them say to the other: "That's him down there now." Witness did not know who was referred to. He went on back to the post office and soon afterwards heard, but did not see, the fatal shooting. He did not see Christy Williams in Wheeler's saloon.

The material part of the testimony of E. H. Jones, a witness for the State, was to the effect that he was at Felker's store and at Wheeler's saloon a few minutes before the shooting. Defendant and Springfield, neither of them having a gun at that time, invited the crowd present to drink. Witness stepped out of the saloon and soon afterwards Eck McDade and several others came out, but witness saw no more of defendant or Springfield until after the first shot was fired. When the shooting commenced the witness ran to Haveman's corner, and saw Springfield standing on the sidewalk. He said: "That is

the way we do the damned sons-of-bitches." About this time Deputy Sheriff Tommie McDade came running to the crowd with a six shooter. Springfield remarked: "I am ready to surrender." Phil Duer said: "Boys, this thing has gone far enough." Springfield again said that he was ready to surrender, and added, speaking to defendant: "Come on, Jack." Defendant remarked that there were other damned sons-of-bitches in the store, and the party, including Springfield and defendant, Tom and Eck McDade and Phil Duer, went up the street, and witness saw them no more.

George Burton, recalled by the State, testified that on his way down the street, to the point where he shook hands with Allchin, he met Springfield going hurriedly towards Wheeler's saloon. He then had no gun in his hands.

E. Crews testified, for the State, to the effect that just after the shooting was over, he met defendant, Springfield, T. S. McDade and Eck McDade, going towards the court house. Defendant shouted and said: "We got him that time, Uncle Tom!"

At this stage of the proceedings a saddle and a suit of clothes were introduced in evidence by the State. They were identified as the saddle used and the suit of clothes worn by deceased when killed.

The State closed.

James A. Felker was the first witness for the defense. He testified that he had known the deceased about five years at the time of his death, during which time his relations with deceased were of a very friendly nature. He was not on the bond of the deceased to appear and answer an indictment charging him with the murder of Chambers. The deceased was wounded in the fight with Chambers, and was confined to his room about three weeks as the result of his wound. During the time that the deceased was thus confined, two gentlemen came to witness and requested his co-operation in an attempt to bring the trouble between the deceased and the McDades to an amicable settlement. They assigned to the witness the part of intercessor with the deceased. The witness at first declined to have anything whatever to do with the matter, but finally agreed to act in conjunction with Mr. Pinckney in appealing to Allchin and the McDades for peace. It was then agreed that witness and Pinckney would go to Allchin's house on that night. Witness first called upon Mr. R. R. McDade,

nephew of Sheriff T. S. McDade, and asked him if the McDade side of the trouble was willing for the attempt to make peace to be made.    Mr. R. R. McDade replied that he and Sheriff Mc-Dade were not only willing to accept a peaceable settlement, but were anxious for it; and that it was at his, R. R. McDade's instance that Pinckney and the other gentleman appealed to witness to act as a joint mediator in the matter.    According to this arrangement, witness and Mr. Pinckney went to Allchin's house that night and proposed to him a peaceable settlement— or, perhaps, it might be more properly termed a truce—pend-ing his, Allchin's, trial for the killing of Chambers.    The de-ceased at first refused absolutely to entertain the proposition, declaring that he had no confidence whatever in the "seed, breed or generation of McDades," but the witness vouched for them as honest, upright citizens, and deceased, protesting that he wanted no trouble with the McDades, finally agreed to make terms on an equitable basis, and asked what was required of him.    At this point the witness and Pinckney suspended the negotiation and went back to the McDades to ascertain the terms or conditions they would insist upon.    Captain (Sheriff) McDade said that Allchin must be required to quit carrying his Winchester.    Witness and Pinckney reported to Allchin that he would be required to quit carrying his gun, and he at once positively and emphatically rejected the terms, saying that he had been in the habit of carrying his Winchester since long before the trouble with the McDades, and that, in view of the circumstances surrounding him, he did not propose to go un-armed.    Witness and Pinckney reported accordingly to Cap-tain McDade, who proposed that if Allchin insisted upon bear-ing arms as a necessary precaution to his protection, he, as sheriff, would license him, Allchin, to carry a pistol.    This proposition was made to Allchin, who rejected it, saying that he would not discard the gun he had been long carrying for a pistol, in the use of which he was totally unpracticed.    The witness and Pinckney, as mediators, agreed that Allchin could continue to carry his Winchester, but only as he had hitherto carried it,—that is, on his horse or in his buggy, but not on the streets of Hempstead when on foot.    In short, the agreement was that Allchin was to carry his gun as he had been in the habit of carrying it; and up to the time of the killing of Cham-bers, with one exception, he had never, so far as the witness knew, carried his gun in his hands, but always carried it either

in his buggy or in a scabbard on his horse. The exception
mentioned by witness was soon after a difficulty he, Allchin,
had with Mr. Dan Woods, and on the occasion referred to he
was in his buggy with the gun in his hands.

A few days after this agreement was entered into, the wit-
ness saw Allchin walking on the streets of Hempstead, carry-
ing his gun in his hands in violation of the agreement. Fear-
ing that the McDades might meet him, and that his manner of
carrying the gun might provoke trouble, the witness went to
Allchin, reminded him that he was carrying his gun in a man-
ner prohibited by the agreement, and appealed to him to desist.
Witness said to him: "Now place yourself in their position.
Suppose you should come to town and find them walking the
streets with Winchesters in their hands, would you like it?"
Allchin replied: "By Gosh, you are right. I have not thought
about that." He then promised that he would not again violate
the agreement, but on coming to town in his buggy he would
leave his gun in his buggy, and on coming to town on horse-
back he would leave his gun in one of the stores until he should
get ready to leave. On the evening of that day or the morn-
ing of the next Mr. R. R. McDade, having heard of Allchin's
violation of the agreement with regard to the carrying of the
gun, came to see witness about it, and witness told him that
he had already complained to Allchin about the violation of the
compact, and that Allchin had promised not to violate it again.
Subsequently Captain (sheriff) McDade had an interview with
the witness about the agreement, and Allchin's violation of
the condition that he was not to carry his gun in his hands on
the street—the other condition being that the McDades, includ-
ing Dick Springfield, were not to molest Allchin, and that
either party hearing of threats uttered by the other was to re-
port the same to the witness and Pinckney for investigation,
before acting upon them. In that interview Captain McDade
was told that Mr. Allchin had promised not to carry the gun
again in violation of the contract, and he said that the viola-
tion then complained of not having resulted in a rupture, it
made no difference, but that if the act was repeated the agree-
ment would be considered "off" by the McDade party, and
that he, Captain McDade, would no longer be responsible for
the future conduct of the McDade boys and Springfield. The
carrying of the gun in his hand on the streets, by Allchin on
the occasion referred to, the witness considered a positive vio-

lation of the agreement, and he knew of nothing having occurred to justify or excuse the violation.

On the Tuesday morning before Saturday on which he was killed, Allchin came to see the witness about the trouble between him and the McDades. He was unarmed. He came into witness's office while witness was preparing to go to Austin to attend the interstate drill. Witness said to him: "Good morning, Steve. I am glad to see that you have not got your gun." He replied: "I have promised you that I will not carry it any more, and I do not propose to do it without your permission; but I have come to tell you that they are laying their plans to kill me." The witness said to him: "There is not a word of truth in it." Allchin replied: "Yes they are, and I can name the boys who are going to do it. Jack McDade and Dick Springfield are going to do it, and they are going to do it right out out there" (pointing towards Zeisner's establishment.) Witness replied: "You are a fool, Steve; those people are honorable and if you pursue the course I have advised for you, they won't trouble you." Allchin protested his conviction that the McDades were planning to kill him, and witness asked him if he had had any further trouble with them. He replied that he had not; that, on the contrary, Jack McDade had recently overtaken him on the highway, and that they rode some distance in company, conversing on friendly terms, but that he had received his information "too straight" to doubt that they were planning to kill him. Witness again told him to abide by the contract and he would not be hurt, and then remarked to him: "I am going to Austin to the drill, and will be gone two or three days, and have not time to now investigate this matter, but I will look into it as soon as I get back. Meanwhile you keep out of town. If, when I get back, I find there is any truth in this suspicion of yours I will let you know it. I am placing myself between you and them, and if they should violate their obligations, I would feel very bad about it." Allchin replied: "I would rather have my right arm cut off than to do anything without letting you know." He then started off but came back and said: "I want to let our first contract stand." Witness replied: "You must not carry your gun on the street, and if you do you will do it at your peril." He then asked witness: "If I stay on my horse or in my buggy, will I be violating that contract?" Witness told him that he would not, and he left. Witness went to Austin on that day and did not get

back to Hempstead until Friday night—the night before the tragedy.

The agreement, contract, truce, or whatever it should be properly termed, did not permit Allchin to get off his horse with his hands and flourish and display it publicly on the railroad depot, and if he did that on any occasion after the agreement was entered into it was a violation of the same, and must have been known to him as a violation. The trouble which resulted in the killing of Chambers by Allchin, and the subsequent killing of Allchin, grew out of an article published in a local newspaper, the authorship of which was attributed to Allchin. The witness never believed that Allchin wrote that article, and when attending on Allchin when he was "laid up" by the wound received in the fight with Chambers, the witness said to him: "Steve, I have never believed you wrote that article. Did you write it or not?" He replied: "Well, I daddied it, all the same." Speaking of the trouble with Chambers, Allchin on that occasion remarked: "There are seven or eight men who ought to have come to my help in that trouble, but only two or three came." At that time there were several men about Allchin's house, including, as witness remembered the names, a Mr. Davidson, a Mr. Williams and a Mr. Floyd. He had also seen a man named Clark about Allchin's house. He knew a man named Swain, but had no recollection of ever seeing him about Allchin's place. Davidson, at the time of Allchin's death, was a stranger in the community. Davidson, armed with a Winchester, was with Allchin on the streets on the occasion when Allchin, in violation of the agreement, was carrying a Winchester. Captain McDade complained about Allchin being accompanied by an armed stranger. Witness informed Allchin of that complaint, and stated to him that, in view of the relations existing between him and the McDades, the McDades were not unreasonable in objecting to his parading the streets in company with an armed man who was unknown in the community. Allchin explained then that the reason he had his Winchester on that occasion was that he had left it in a certain store; that the proprietor of that store had closed it and gone home, and he took the gun out because he did not know but that he would need it before the store keeper came back; and that Davidson was armed in anticipation of trouble with a party who had threatened his life. He promised not to again associate with Davidson on the streets. Witness did not know

whether or not he kept that promise. If Davidson ever worked for Allchin, the witness did not know it.

On his cross examination, the witness said that he did not understand the agreement to preclude Allchin from carrying his gun across his lap when on horseback, but it did preclude him from having it in his hands on the streets. The parties to that agreement were Allchin on one side and T. S. McDade, Jack McDade, Eck McDade, Tommy McDade and Dick Springfield on the other; T. S. McDade agreeing to be responsible for Dick Springfield. Allchin did not tell witness, on the day witness went to Austin, who the parties were that told him Jack McDade and Dick Springfield, under plans agreed upon, were to kill him, but did tell him that he got it too straight to doubt the fact. Either party to the agreement, hearing of threats by the other, was to report the fact to the witness, and he was to investigate the truth of such reports and stop them. When witness started to Austin, Allchin promised that while witness was gone he would do nothing to arouse the suspicion or apprehension of the McDade party. He said at the same time that he would suffer his right arm to be cut off, or would die, before he would go back on his contract, and that he would never attack the McDades, but would act only on emergency and in self defense. It was under the agreement referred to that Allchin came to witness about the alleged plan of the McDade party to kill him. Witness did not investigate the charge thus made by Allchin, because he had to go to Austin to get his family, and did not have an opportunity to investigate on his return. Allchin persistently declared his confidence in the existence of the plan to kill him, and when witness told him that the McDades and Springfield would not kill a man for fun, and would not molest him, he replied: "I have confidence in you, but not a particle in the seed, breed or generation of McDade." The witness knew by common report that a guard of armed men was kept about Allchin's house after the killing of Chambers, but he did not personally know that fact, and did not know that the guard was put there by the county. It was distinctly understood as a part of the agreement that neither party were to pay any attention to irresponsible rumors of threats uttered by the other, but that any threats reported to them through a source in which they had confidence were to be reported to and investigated by the witness. The "first contract" referred to by Allchin in his conversation with witness on Tuesday morn-

ing, when witness started to Austin, was his, Allchin's, original proposition, at the beginning of the negotiation, that he be permitted to carry his gun in any way that he pleased, including his hands. To that witness replied: "That will never do." Captain McDade never reported any threats to witness as having been made by Allchin.

Continuing on cross examination, the witness said that when Allchin admitted that he had "daddied" the article in the local newspaper. which created the feud, he talked to witness freely and unreservedly about the killing of Chambers. He told witness he regretted that occurrence extremely; that he would not have killed Chambers could he have avoided it, but that he had to kill him, run, or get killed himself; and that he realized positively that had he not killed Chambers he would have been killed himself. He said that of the seven or eight "sons-of-bitches," who ought to have come to his rescue, only three came, the only one of whom, whose name he mentioned, being Jim Armstrong, the druggist. He described to witness one of the encounters he had with Chambers before the killing, as follows: "I went to your (witness's) store and bought something, and from there I went to Haveman's to buy a bridle. While I was in Haveman's, Chambers walked up to me, handed me the paper and asked me: 'Did you write that?' While I was reading the article it suddenly flashed across my mind that he would shoot me while I was reading it, and I handed the paper back to him and said to him: 'You read it, Dick. I did write it, and I have no apologies to make and nothing to take back.' He said to me: 'You have got the advantage of me now, but I will see you some other time.' I said to him: 'You are armed with a six shooter, and we can settle it right now.' Chambers said: 'I will see you another time when I am in town.' I then backed out of the store with my rifle in my hand, and Chambers came out and told me when he would be in town."

This witness was examined at considerable length but little more of material importance was adduced. He stated that the agreement contemplated that Allchin was to carry his gun as he had theretofore carried it, and that, as he had always before carried it in a scabbard, he, witness, considered his obligation to be to continue to carry it in the scabbard. The carrying of the gun across his lap, after displaying it in the manner stated by the witness Johnson, on the depot platform, on the fatal

morning, the witness considered a violation of the agreement. Allchin was expert in the use of a Winchester rifle.

Phil Duer was the next witness for the defense. He testified that he heard the reports of the fatal shots, and at once started down the street. He met Springfield first and then defendant, both armed with guns. He met Springfield between the stores of Fried and Keiser, in the Haveman block. He asked Springfield what was the matter, and Springfield replied: "The damned son-of-a-bitch tried to kill me and I shot him." The witness and Pointer were the first parties to reach Allchin's body after the shooting, and at that time they examined Allchin's Winchester, which they found lying partly under the body. The guard was pulled clear back, and the gun would not work until a cartridge was taken out of it. That cartridge showed an indentation which looked like the hammer of the gun had snapped on it. The witness had no personal knowledge of the truce agreement entered into between Allchin on one side and the McDade party on the other, but on one occasion, after Allchin got well enough of the wound inflicted upon him by Chambers, the witness saw him on the streets of Hempstead with his Winchester in his hands. The man Davidson was with him, and he, too, was armed with a Winchester. They got out of a buggy with the Winchesters in their hands, and entered a store or barber shop. Witness did not see them come out. Soon after the killing of Allchin the witness sent his, Allchin's, gun to Mrs. Allchin, and afterwards he and Lipscomb went to Mrs. Allchin's house and got it. Witness and W. T. Duer were brothers, and they were related to the defendant. On the Thursday preceding the fatal Saturday, the witness went with Springfield to Waller station, in search of a man who was "wanted" for crime in Montgomery county.

County Attorney Lipscomb testified, for the defense, that he went with Mr. Duer to Allchin's house and got Allchin's gun, which had been sent to the house with the body about an hour before. The said gun was then taken to witness's office. Two cartridges were then removed from it, one from the barrel and one from the magazine. The cap on one of the said cartridges showed an indentation such as would result from the snapping of the hammer on it. The witness was well acquainted with the defendant and Captain T. S. McDade, and with their respective reputations for peace and quietude. It was good.

Allchin's reputation was that of a dangerous character and an expert in the use of a Winchester.

On cross examination, the witness said that he reached Allchin's body a few minutes after the killing. One of the persons present—Mr. Duer, according to witness's recollection—picked up Allchin's gun. Witness then examined the said gun and found the slide pulled back and open. Correcting himself, the witness said that he was not positive that the gun had a slide, but the place where there should have been a slide was open and contained a cartridge. A considerable quantity of sand was on the gun. This witness and Duer both testified that the parties present at Mrs. Allchin's told them that the gun was not handled nor examined by anybody after it reached the house. .

R. R. McDade testified, for the defense, that he was one of the parties who negotiated the "truce" agreement testified about by Felker. He represented the McDade side. Mr. Hanks asked him one evening if the matter of the quarrel could not be settled by the intervention of friends. Witness replied that he would see Captain McDade, Felker and Pinckney, if he, Hanks, would see Allchin. Witness went to see Captain McDade, who agreed at once to enter into a compromise. The negotiation was then conducted by witness interviewing the McDades and Felker and Pinckney interviewing Allchin. The terms first proposed by Captain McDade were that Allchin was not to parade the streets with his Winchester, but to "lay it down." Allchin refused to quit carrying his Winchester altogether, and it was finally agreed that Allchin was to carry his gun exactly in the manner he had previously carried it. He had customarily carried it in a scabbard attached to his saddle, and the witness understood the agreement to confine him to that manner of carrying it. On the Thursday or Friday of the week preceding the fatal Saturday, the witness's son reported to witness that he had just seen Allchin and Davidson on the streets with Winchester guns in their hands. On the very next morning witness went to Felker and complained about this violation of the compact. Felker replied that he had already taken Allchin to task about it, and that Allchin admitted that he had wrongfully carried the gun, and promised that he would not so carry it again. Three or four days later General Bedell reported to witness that he had just seen Allchin and Davidson, both armed with Winchesters, on the street between Arm-

strong's drug store and the barber shop.   Witness again com-
plained to Felker about Allchin and Davidson, the latter being
then a stranger in the community, parading the streets armed
with Winchesters.   Felker subsequently reported to witness
that he had seen Allchin, and that Allchin had promised not to
violate the agreement again, and not to be again found on the
street with Davidson while the latter was armed with a shot
gun.   Witness and Felker as mediators, had a final meeting
after this with the McDade party.   The parties present at that
meeting were witness, Felker, Captain T. S. McDade, Jack,
Tom and Eck McDade and Dick Springfield.   On that occasion
Captain McDade complained about the persistent violation of
the compact by Allchin, and said that if it was again violated
by him he would no longer be responsible for his boys.   Wit-
ness presumed that Captain McDade's said complaint and state-
ment were reported to Allchin, as he soon afterwards saw
Allchin in his buggy in front of Felker's store.   After this final
meeting Captain McDade asked for a personal interview with
Allchin, but witness could not say, and in fact did not suppose.
that Felker proposed it to Allchin, as, when he subsequently
called Felker's attention to the matter, and asked him why he
did not bring the meeting about, Felker said that "Steve is such
a hot headed fellow I can not trust him."   The witness was a
nephew of Captain T. S. McDade and a cousin of the defend-
ant.

Deputy Sheriff Claude Loraine testified, for the defense, that
he got back to Hempstead from the Austin drill on the morning
of the tragedy.   He remained at the depot until about eight
o'clock, when he went to the jail where Dick Springfield, then
acting office deputy, showed him a letter, which letter was ad-
dressed to the sheriff, giving the description of a certain fugi-
tive from justice, and asking for his arrest.   The witness at a
later hour started from the said jail to the house of Burton, his
father-in-law, to get breakfast.   En route he passed along in
front of the Haveman block, and saw a stranger standing by a
post at the corner of Haveman's store.   That man in appearance
corresponded with the description of the fugitive from justice
as given in the letter.   About ten minutes later witness went
into Ingram's saloon where he again met Dick Springfield.   He
then told Springfield that he had just seen a man standing at
Haveman's corner, who corresponded in appearance with the
man described in the letter.   Springfield then asked witness to

go with him and help him arrest that man, but witness declined and went on to Burton's, got breakfast, and slept for a while. When he got up he heard about the shooting. The witness was informed of the "truce" compact between Allchin and the McDades, and understood that compact to require of Allchin to carry his gun just as he always carried it before, and that was in the scabbard. The stranger referred to by witness may or may not have been the man seen by Mr. Pointer on Haveman's corner. The witness was not with Pointer and did not see the man at that time.

James Avery was the next witness for the defense. So far as material, his testimony discloses that a few minutes before the killing he and Cameron, Burton, Nast and Miller stepped into Zeisner's saloon to get a glass of beer. While they were in there Allchin rode up to the pavement on his horse, and sent a negro into the saloon to get a dollar changed for him. About the time the negro handed the dollar to Zeisner the witness and his party stepped out of the saloon and each of them shook hands with Allchin, who was then sitting on his horse facing "sort of southeast of northwest with his left side to the south." He had his Winchester across his lap, with his right hand on the breech, his left hand holding the bridle reins, and his leg thrown around the pommel of the saddle. When the witness had shaken hands with Allchin and stepped off about eight feet somebody exclaimed, "look out," and witness, seeing defendant and Springfield on the sidewalk near Haveman's, sprang into Haveman's store and did not see the firing of the shots. The witness at no time before the shooting saw any change in the position of either Allchin or his horse. The witness met Allchin several times on the streets of Hempstead after he was said to have entered into the agreement with the McDades, and on each of those occasions he was carrying his Winchester in his hands. On his cross examination the witness said that when he first saw the defendant and Springfield, just as Mr. Burton gave the alarm to "look out," one of them had a gun partly raised. Witness was between them and Allchin, and, knowing them to be hostile, he did not tarry in that position to witness the subsequent proceedings, but got into Haveman's store as speedily as possible. Witness did not see Allchin at the instant the alarm was given by Burton. He did not see Allchin raise or attempt to raise his gun at any time.

Frank Lipscomb testified, for the defense, that he heard but

did not see the shooting, and reached Allchin's body about twenty-five minutes after he was killed. Allchin's gun was then lying by the body, but witness could not say that it had not been taken up and put back before that. The guard and slide were entirely back, exposing one cartridge in the barrel and one in the magazine. It was an old gun and the slide was quite loose. A jar would not throw back the slide of such a gun in good repair. On his cross examination, the witness said that he did not pick up the gun, nor did any other person while witness was present. It was on the ground when witness saw it, and it was then at full cock. The lever was not off the cartridge.

H. J. Harvey was the next witness for the defense. His attention was called to a certain note which he identified as a note he wrote to Dick Springfield, and sent to Springfield a day or two before the killing. The note is not set out in the statement of facts, nor does the testimony clearly disclose the substance of its contents, but it is clearly to be inferred from the statements of the witness that it was a warning to Sprinfield to expect trouble with Allchin, or danger from Allchin and his friends, on the following Saturday—the Saturday of the killing. The witness admitted that the information conveyed to Springfield was not obtained by him from any direct source, and his testimony clearly indicates that he informed Springfield that a man named Davidson was then in that part of the county of Waller in which the witness lived, acting ostensibly at the instance of Allchin, and summoning Allchin's friends to assemble in Hempstead on Saturday, under arms, and for a hostile purpose in connection with the Allchin-McDade feud.

Mr. Willis, the next witness, was subjected to an exceedingly close and searching examination by the defense, and an equally rigorous cross examination by the State. The material substance of his testimony was that he lived in Waller county, Texas, about thirteen miles south of Hempstead, and three or four hundred yards distant from the house of the preceding witness Willis. The witness served on the jury at the trial of the "Anderson case," at the March term, 1888, of the Waller county district court. As he left the court house after the verdict in that case was rendered, being then in company with Jake Quillen, a neighbor, the witness met Allchin, who remarked to him: "Well, you turned Anderson loose." Witness replied in the affirmative. He then said something which

amounted to an invitation to witness to join a club, adding: "Jake will tell you about it." Witness at once asked Quillen about the club, and Quillen advised him to go to the drug store and see Armstrong about it. After this, and before the killing of Chambers, which killing occurred in April, 1888, witness and Allchin rode out of Hempstead together. Allchin had previously told the witness that the McDades had assassinated one person, and that he expected them, in connection with Dick Chambers as the active agent, to attack him. As they approached the jail on this occasion, Allchin said to witness: "Will, you had better either ride on ahead of me or come on behind." Witness's next conversation with Allchin was after the killing of Chambers and but a few days before he was killed himself. On that occasion he met Allchin, who had his Winchester in his hands, near Haveman's store, and during that meeting Allchin told witness that he killed Chambers, and that he was justifiable in doing so; that Springfield intended to kill him, Allchin, but that he intended to get the drop on Springfield; that he, Allchin, had been going about the streets of Hempstead, using his Winchester as a walking stick, but that Springfield had not taken it up, and that the coming Saturday—which proved to be the fatal Saturday—would be the last day that Springfield would walk the streets of Hempstead. In the course of a previous conversation about Captain McDade's canvass for re-election as sheriff of Waller county, Allchin said to witness: "He (Captain McDade) can not be beaten. He will get a majority every time, and the only way to beat him is to get him out of the way." He did not say that he, Allchin, was going to put McDade out of the way, nor did he suggest any mode in which it could or should be done.

On the Tuesday or Wednesday preceding the fatal Saturday Allchin charged the witness to tell Jake Quillen that "the thing was coming off on Saturday," and that he, Allchin, hoped Quillen would be in town on that day. Witness did not deliver that message to Quillen, but late on Friday evening Quillen went with witness to witness's house, where they found a Mr. Polk who had come to return a borrowed plow. The witness invited Quillen and Polk to take supper with him, but they declined, and retired to a point behind the house, where they conversed privately for an hour. Witness overheard that conversation in part. He could not repeat what he heard, word for word, but the substance of it was that Allchin wanted Quil-

len to go to Hempstead on the next day, and that the message to that effect was brought by Davidson. Mr. Quillen was a special friend of Allchin.

On cross examination the witness declared that, while he and Captain McDade, during the latter's life time, were particular friends, he and this defendant were not especial friends. In the conversation at Haveman's, detailed on direct examination, Allchin told witness that he wanted him, witness, and all of his friends to come to Hempstead on Saturday, and that he wanted them to come armed; that he was going to station his friends at different points on the streets of Hempstead, and that, if the McDade party interfered with them, he and his party would "get away" with them. Witness replied to Allchin's invitation to join him that he had a family to provide for, and that upon principle he could take no part in such an enterprise. Allchin then asked witness to say nothing about what he had told him, but to tell Quillen not to fail to come to Hempstead on Saturday. Witness did not report his conversation with Allchin to Springfield or either of the Mc-Dades. Allchin was a "straight man" whom the witness liked, and he readily agreed to and did comply with Allchin's request to repeat nothing he had said, but he did not deliver Allchin's message to Quillen. Witness went to Hempstead on the fatal Saturday, but not in consequence of Allchin's request. He reached Hempstead about thirty minutes after Allchin was killed. He went first to Zeisner's saloon, and then to the jail, where he saw the defendant and Springfield. He went to the jail to satisfy a curiosity common to him and the majority of other people—to see the men who did the killing. He did not then tell Springfield nor any of the McDades what Allchin said to him on the previous Tuesday or Wednesday. He did not tell that until some time after the killing, and among the first persons whom he told was Mr. Jim Bethany, who was his, witness's, uncle and the defendant's father-in-law. Jake Quillen went to the jail with witness on the fatal Saturday, after the killing. The forty or fifty other people then in the jail the witness understood to be a crowd collected by the sheriff to protect defendant and Springfield. Witness was not a part of that guard. Witness and old man Harvey and Charley Quillen went to Hempstead on Monday after the killing to get a coffin in which to bury one Frank Shelby, who died on Sunday night. Near Three Mile creek they met old man Wommack at

the head of a mob of forty or fifty men who had organized on said Three Mile creek on the preceding night. The mob was moving away from Hempstead. Old man Wommack said that they intended at first to go to Hempstead and "take out" the defendant and Springfield. He then said to Harvey and witness: "You tell old man Tom McDade that I am sorry I undertook this thing; that we were going there to see the laws put in force; but we have found out that we are wrong and are on our way back." Witness did not go the jail on that day, and did not see either defendant, Springfield or Captain Tom McDade.

Pillott Wood was the next witness for the defense. The material substance of his testimony was that, subsequent to the killing of Chambers by Allchin, he frequently saw parties about Allchin's house who appeared to stay there. Of that number the witness only knew Jimmy Clark. He did not know Davidson, Floyd, Swain nor Charley Wall, nor could he say that they were among the parties who stayed about Allchin's house. About two weeks previous to the fatal Saturday, which was subsequent to the killing of Chambers, the witness, in passing Allchin's house, saw a crowd of men shooting at a mark with Winchesters. He recognized only Allchin and Clark, The witness saw Allchin in Hempstead, armed with a Winchester, about two days before he was killed. He was on horseback.

On his cross examination the witness said that he had known Allchin for several years. Allchin's reputation was that of an ordinarily quiet, peaceable law abiding citizen, but dangerous when aroused to anger, and easily aroused. The witness was one of the sureties on the appearance bond of Allchin for the killing of Chambers. The killing of Chambers and the subsequent killing of Allchin did not grow out of a political feud, but out of enmities engendered by the publication in a local newspaper of an article attributed to Allchin, reflecting severely upon the grand jury and certain of the county officials. The witness was a member of the impugned grand jury. After the killing of Allchin the feud over the published article was taken into politics to secure the defeat of Captain McDade in his canvass for re-election as sheriff. The witness had never heard the character of Allchin impeached as a quarrelsome bully. He saw Allchin near the freight depot on the day before he was killed. He was on horseback and had his Winchester across his lap. The witness knew, by current report, of the

compact then existing between Allchin on one side and the
four McDades and Springfield on the other.   As to the manner
in which Allchin carried his gun being a violation of the com-
pact, the witness had no opinion to express other than that he
thought if he had been in Allchin's place he would not have
carried the gun at all under the circumstances.   The witness
could not be induced to believe from what he knew of Allchin,
that he would "put up a job" to assassinate a man.   He was
an honest, hard working, economical man.   Captain McDade,
until he retired from the contest for sheriff, was running as the
candidate of the Republican party.

N. A. Cuney testified that he was the present owner of the
gun owned by the defendant at the time of the killing of All-
chin.   It was a hammerless gun, and would not make a noise
in preparation for discharge that could be heard at a greater
distance than four or five feet.   It did not make a noise in any
way similar to the noise made by the cocking of an ordinary
gun.

P. H. Floyd testified, for the defense, that he was the Floyd
who stayed at times at Allchin's house, and who was referred
to by other witnesses in this case, and his home was in Wash-
ington county.   Allchin was a "sort of" cousin to the witness.
He sent Davidson and Jim Clark to hunt for witness on Friday
of the week preceding his death.   His reason for sending for
witness was, as stated by him, that he had heard a rumor to
the effect that the witness was drowned.   Witness remained
at Allchin's until Tuesday before the fatal Saturday.   While
at Allchin's house Allchin told witness that he was going to
send into the country for Jake Quillen and others of his friends
to assemble in Hempstead under arms on the following Satur-
day; that Davidson was to go after Quillen and his said friends,
and on Saturday was to post those men at different points on
the streets of Hempstead; that he expected to have a little
difficulty in Hempstead on that day; that Davidson was to ride
through the streets of Hempstead armed with a Winchester and
start the fuss by making remarks; that he wanted witness to
come to Hempstead on that Saturday, and to come armed with
a Winchester rifle if he could borrow one.   The witness agreed
to be in Hempstead on the said Saturday, but made no promise
about helping Allchin in the fuss he was to provoke through
Davidson.   On the following Friday evening—the evening be-
fore the killing—the witness borrowed a Winchester rifle from

Phil Huffman.   Huffman asked him what he wanted with the rifle.  He replied that he wanted to kill rabbits with it, which was the truth.   Witness did not go to Hempstead on the fatal Saturday, as he promised.   While on the said visit to Allchin's house, the witness, Allchin and several others, including Davidson, Clark and a man named Swain, four or five of the party being armed with guns, went to the Brazos river in a wagon. They had no other object in going to the river than to see the extent of the rise in it.   Witness heard nothing said by anybody about defendant on that trip.

Cross examined, the witness said that when Allchin asked him to come to Hempstead on Saturday, he said that he was going to have a little difficulty.   He did not say what he was going to do, but did say that either Jack McDade or Dick Springfield would "bite the dust."   Further interrogated the witness stated that on that occasion Allchin told him that he was going to settle the difficulty without a fuss if he could, but that he expected to have a difficulty, and if he did Jack McDade or Springfield would "bite the dust," and he wanted witness in town to help protect him.   He did not designate the various points where Davidson was to station his men, nor did he, that witness remembered, state what particular remarks Davidson was to make on the streets, as a means of starting the fuss.   If the witness testified on the habeas corpus trial that Allchin told him that Davidson was to ride through the streets of Hempstead armed with a Winchester, hallooing: "Hurrah for Allchin! and that if Jack McDade or Springfield interferred they would bite the dust," then that testimony was true. It was on Tuesday that this conversation between witness and Allchin occurred.   It occurred in the yard at Allchin's house. It was on the same day that the party went to the river.   Allchin was in Felker's store talking to Felker on that morning before he went to the river.   Witness crossed the river and went home, and did not go back to Allchin's house on that day.   In the same conversation above referred to, Allchin told the witness that his life had been threatened by certain parties.   The witness did not think that, on a previous examination of this case, he testified that he failed to go to Hempstead on the fatal Saturday because the river was too high to be crossed.   As a matter of fact he was prevented from going by a combination of business and high water—the business being the insuperable obstacle.   He promised Allchin to be in Hemp-

stead, but did not promise him to take part in the fuss. The witness borrowed the Winchester for the purpose of killing rabbits and not for the purpose of participating with it in the fuss between Allchin and the McDades. Since the preliminary trial of this defendant the witness had married the sister of a man who was now under indictment for the murder of Captain T. S. McDade.

The defense closed.

Mike Floeck was the first witness introduced by the State in rebuttal. He had handled Winchester rifles ever since they had been in the market. Winchester rifles were usually carried with the hammer on the half cock. If the hammer was down on the cartridge there was constant danger of explosion by contact with other objects.

J. A. Loggins testified for the State, that he was near Springfield and the witness Duer when they met in front of Fried's store just after the killing of Allchin. Springfield did not say to Duer, at that time: "He tried to kill me and I shot him." Springfield said nothing to Duer at that time. He could not have spoken to Duer without witness hearing him. On cross examination this witness said that Springfield and defendant went north together just after the shooting, Springfield perhaps a little in advance. They passed Pointer, witness, Duer and others in front of Fried's store. Springfield made no remark to any body in passing that point, that the witness heard. When Springfield and defendant passed Fried's store Duer was on his way to the body.

George Arnold testified, for the State, that he had known Allchin at the time of his death about eight years, and during that time knew him to be a quiet, peaceable, law-abiding citizen.

Jim Hood testified, for the State, that he was in Hempstead on the fatal Saturday, and met the body of Allchin when it was being removed to his home. He went back to Allchin's house and saw and examined Allchin's gun after it was taken out of the conveyance. It and the body were taken home at the same time and in the same conveyance. That gun was examined and manipulated by Jim Clark before it was called for and taken away by Phil Duer and Mr. Lipscomb. Clark worked the lever and threw out a cartridge or two, which he put back. Besides the witness, Jake and Charley Quillen were present when Clark manipulated the said gun at Allchin's house. The

.gun was examined at the time because a little boy who was present said the gun was fired twice during the fatal transaction. Clark, after examining the gun, declared that it not been recently discharged.

Jake Quillen was the State's next rebutting witness. He testified, respecting the examination of the gun at Allchin's house, after Allchin's body was brought home, substantially as did the witness Hood. He stated further that he went to Allchin's house on the fatal Saturday to complete a horse trade with Allchin. He was unarmed. He knew nothing of the killing of Allchin until he got to the house. Witness was an intense friend of Allchin, and was one of the crowd or mob that organized on Three Mile creek on the Monday morning succeeding the tragedy. Charles Graham testified substantially as did Hood and Quillen about the examination of Allchin's gun, at the house, before it was taken away by Duer and Lipscomb.

Dr. L. W. Groce testified, for the State, in rebuttal, that he saw Allchin's gun and body before either was removed from where they fell. The gun was *not* cocked but was half-cocked, and the slide was open and nearly filled with sand. Witness thought that Allchin was in the habit of carrying his said gun half cocked, and Allchin told him that he always carried it with the slide open.

John Pinckney testified, for the State, that he was one of the mediators, or parties who negotiated the "truce" or compact between Allchin and the McDades. One of the conditions of that agreement was that all threats uttered by either party that came to the ears of the other were to be reported by the threatened party to the mediators for investigation. No notice of threats was ever given to the witness by the McDade party. Witness got to Hempstead from Houston at eleven o'clock on the morning of the fatal Saturday. He was of counsel for the State in this case, and worked up the prosecuting evidence for the examining trial.

The foregoing statement of the case is very greatly condensed from nearly two hundred pages of testimony set out in the record, but is believed to comprise all the material evidence.

The charge of the court referred to in the second head note reads as follows: "The defendant is presumed to be innocent until his guilt is established by the evidence to the satisfaction of the jury beyond a reasonable doubt, and unless the evidence so

satisfies you, in this case, of the guilt of the defendant of murder of the first degree or murder of the second degree, you will find him not guilty. Or if you believe from the evidence that the defendant was first assailed by the said Allchin in a manner, considering the relative condition and circumstances of the parties, to cause the defendant reasonable apprehension of immediate danger of serious bodily harm to himself,—nor would he be bound to retreat in such case,—and that he acted upon this apprehension in defense of himself against the deceased, he would not be guilty of any offense, unless it reasonably appears from the evidence that the difficulty was begun by defendant, or by Dick Springfield acting together and in concert with defendant, with the intent and purpose of killing said Allchin; in which case the defendant would not be excused or justified, but would be responsible for his acts as you have already been instructed."

*Hutcheson, Carrington & Sears* and *Gustave Cook*, for the appellant.

The evidence in this case clearly raised the issue of manslaughter, and the court should have given a charge upon that issue. The rule is invariable and without exception that the law, and all the law, applicable to every phase of the testimony must be given by the court in charge to the jury. (Reynolds v. The State, 8 Texas Ct. App., 415; Neyland v. The State, 13 Id., 266; Old v. The State, Id., 612; Rutherford v. The State, 15 Id., 236; Williams v. The State, Id., 617; Washington v. The State, 19 Id., 266; Johnson v. The State, 22 Id., 225.)

The evidence taken throughout, threats, appearances, acts, etc., required a charge on manslaughter, for the whole testimony, up to and at the time of the killing, raised that issue. (Johnson v. The State, 22 Texas Ct. App., 226; Wheelis v. The State, 23 Id., 238; Barron v. The State, Id., 476.)

The court, having refused to give a charge on manslaughter, should have granted defendant a new trial, for the verdict and affidavits of the jurors—the sole judges of the facts—showed that had that issue been submitted to them they might have determined on that degree of homicide, and not found defendant guilty of murder. The jury, in view of their standing, should have been allowed to pass on the evidence under the law of manslaughter. The facts raised that issue, and the defend-

ant had a right to have them pass on that question, and not the judge.

The court erred in not charging the presumption of innocence and of reasonable doubt in the language of article 727 of the Code of Criminal Procedure, and article 11 of the Penal Code, especially in leaving out the language "legal evidence." (Ferry v. The State, 8 Texas Ct. App., 471; McPhail v. The State, 9 Id., 173; Cohea v. The State, Id., 313; Bramlette v. The State, 21 Id., 611.)

*W. L. Davidson,* Assistant Attorney General, and *Pinckney & Poole,* for the State.

WHITE, PRESIDING JUDGE. This appeal is from a judgment of conviction for murder of the second degree, with the punishment assessed at imprisonment in the penitentiary for a term of eight years.

It is an undisputed, uncontroverted fact that this appellant and one Dick Springfield shot and killed the deceased, S. W. Allchin, with shot guns and pistols, as alleged in the indictment. This appellant does not deny but admits the fact, claiming that he was justifiable in so doing, or at most that his offense in so doing, under the facts developed on this trial, did not amount to murder, but was manslaughter. No issue of manslaughter was submitted in the charge of the learned judge on the trial below, and the omission of the charge in this regard is urgently insisted upon as serious, radical error.

A brief resume of the facts is necessary in order to properly determine the merits of this objection to the charge. About a month before the day of this homicide, the deceased, Allchin, had killed one Chambers, a relative of this appellant and a deputy sheriff of Waller county. Appellant and Springfield were also deputy sheriffs. Out of the killing of Chambers by Allchin a bitter feud and hostility arose between the McDade or sheriff's party and Allchin, which became of so serious a character that mutual friends of the two parties interfered to settle it, and finally succeeded in patching up or arranging an agreement or truce between them. By this agreement or truce it was, amongst other things, stipulated on behalf of Allchin that he was not to go to Hempstead with his Winchester rifle in his hand, but was to carry it in his buggy, or holster or scabbard on his saddle when he was upon horseback, and that to carry it in

any other way was to be considered by the other party as a declaration of hostility. None of the McDades were to molest him in any way, and if either party heard of threats made by one against the other, or of acts against the agreement, they were to report it to mutual friends. A week or so before the killing Allchin, on one or two occasions, was seen by the McDades carrying his Winchester in his hands on the streets of Hempstead, and the McDades complained of it as exciting their serious apprehension of danger. Allchin was told in the final conversation, by mutual friends, that again to carry his gun in his hands would excite apprehension in the McDades' minds and would be to them a declaration of hostility, and he assented to the justice of this statement. Several ruptures of the agreement were shown on the part of Allchin, and these breaches of the contract were known to defendant. A few days before the killing defendant received a written notice from Harvey that Allchin would be in town on Saturday, with his friends, to kill defendant; threats of death were communicated to defendant. The evidence shows threats upon the part of Allchin against defendant, some communicated and others not. On Saturday Allchin came to town on horseback, and was seen at several points in and upon the streets and at the depot. He had his Winchester rifle with him, and was handling it upon the depot platform. There was a public park or square in the center of the town, surrounded on the north and west by business houses. Haveman's corner or business house was the corner house on the south of the west block which fronted this square. On the northwest corner of this square was Wheeler's saloon. Some time before the killing Allchin was on horseback at or near Haveman's corner talking to some friends on the side walk. His horse's head was north, or up the street, in the direction of Wheeler's saloon. He had his back to Haveman's corner, and his leg was thrown over the horn of his saddle, and his Winchester was lying across his lap, half cocked, which was the usual way he carried it for safety from accidental explosion. He could be seen from Wheeler's saloon. A short time—a few moments—before the shooting, Springfield and appellant were near Wheeler's saloon, and one of them was heard to say to the other: "That's him," or "is not that him down yonder now?" They went into the saloon, took a drink, and were next seen to emerge from the rear end of said saloon, in an alley between it and the adjoining building, with

double barreled shot guns in their hands. They proceeded diagonally across the street into the alley in rear of the building on the west side of the square; went down this alley rapidly a distance of six or seven hundred feet from Wheeler's to the street west of Haveman's, and then up said street to the front or southeast corner of Haveman's, which brought them to the sidewalk within a few feet of where Allchin was sitting on his horse, as above described, with his back to them. Just as they got upon the sidewalk, some one exclaimed: "Look out!" and the shooting commenced, and was kept up by Springfield and defendant until deceased fell from his horse, when they went up to the struggling and almost inanimate body and finished the work by other shots from gun and pistol into his head and face, saying, when they had finished by shooting his face off entirely: "That's the way we do men who murder men on the streets." Allchin did not fire a single shot, nor does it appear that he had time to do so, or even time to make an effort to do so. It does not appear that he even saw the parties, or could have seen them from the time they left Wheeler's saloon until they fired upon him.

Evidence was adduced by appellant tending to show that he and Springfield went from Wheeler's saloon to Haveman's corner in the manner they did and armed as they were, for the purpose of arresting a fugitive deperado and murderer from Montgomery county, for whom they had a warrant of arrest, and who was reported to them as having been seen at or near Haveman's corner just before they armed themselves and started by the alley way from Wheeler's, and that their seeing Allchin when they reached the front of the Haveman corner upon the sidewalk was sudden and wholly unexpected.

Upon the above recited state of facts, it is strenuously insisted that on account of the previous threats and acts of Allchin, the fact that he was thus suddenly seen carrying his gun in violation of his agreement, and which in itself was by said agreement a declaration of hostility, the appearances of danger to appellant and Springfield were such as were calculated to arouse a degree of anger, rage, sudden resentment or terror in persons of ordinary temper, sufficient to render their minds incapable of cool reflection, and that, having acted upon such appearances and from such impulses and passion, the issue of manslaughter was clearly raised, and should have been given in charge to the jury as a necessary part of the law of the case.

Suppose, in the light of the most potent if not overwhelming facts to the contrary, we concede for the argument's sake that, as appellant contends, the coming upon Allchin by appellant and Springfield was sudden and unexpected, and without premeditation or intention, could his mere presence, and his presence with his back to them at that, unaccompanied by a single hostile word or deed, save the single fact that he had his gun across his lap, have aroused in the mind of a person of ordinary temper any of the emotions of the mind calculated to render it incapable of cool reflection? But it is said his having his gun in his lap, and not in his scabbard, was according to his own solemn agreement and contract, an overt act of hostility, as much so as if it were directly drawn and presented upon them. If such had been the spirit and intent of the agreement as between the parties, the law could not afford to tolerate, much less recognize a doctrine so variant from and at war with every principle it maintains for the welfare of society and the protection of human life, and sanction or mitigate the taking of human life under such pretext. Because it was so "nominated in the bond" could neither justify nor mitigate or excuse it, if in contravention of the law. The law can not and will not permit men to kill each other with impunity, notwithstanding they may have bound themselves to that effect with each other by the most solemn obligations.

It was held at one time in Kentucky "that if a man feels sure that his life is in continual danger, and that to take the life of his menacing enemy is his only security, he may kill that enemy whenever and wherever he gives him a chance, and there is no sign of relenting." (Carico v. Com., and Phillips v. Com., Horrigan & Thompson's Self Defenses, pp. 383–389.) But this doctrine has been overruled even in that State (Bohannon v. Com., Id., 395), and has never, so far as we are aware, been recognized as the law elsewhere. Such a doctrine would make the bare presence of an enemy an overt act justifying his destruction.

But, it is said, Allchin was not only guilty of a "declaration of hostility" by the manner in which he was carrying his gun, but, in addition thereto, he had made threats that he would kill the McDades or any of them he might get an opportunity to kill, on that very day. In Johnson v. The State, 27 Texas, 758, Judge Moore says: "In no case under the provisions of the Code, or out of it, if we were permitted to look elsewhere to

ascertain the law upon the subject, can it be held that mere threats, unaccompanied by some demonstration from which the accused may reasonably infer the intention of their execution by the deceased, either justify such homicide or reduce it from murder to manslaughter.     *     *     *     The doctrine contended for must, therefore, be narrowed down to this simple proposition: that the mere fact of being encountered or overtaken in the street or public highway by one who has threatened another's life some months before, without any act whatever indicative of an intention of then carrying such threats into execution, is 'adequate cause' to excite such 'anger, rage, sudden resentment or terror' as renders the mind 'incapable of cool reflection.' The bare statement of this proposition is sufficient for its refutation. If such was the case, the language of passion, forgotten with the occasion which gave it utterance, the idle talk of the silly or the inebriate, must be paid for with the penalty of life. A full floodgate would be given to the most wicked passions, and murder, fearful as it already is, in a ten fold greater degree would stalk through the land, clothed in the panoply of law." (Penal Code, art. 594; Willson's Crim. Stats., sec. 1009.)

Under our statute with regard to threats as evidence (Penal Code, art. 608), "it is not practicable to fix on what the act manifesting the intention of the deceased to execute his threats shall be, but it must be some act reasonably calculated to induce the belief that the threatened attack has *then* commenced to be *then* executed, and not a mere act of preparation to execute the threats at some other period of time, either speedy or remote." (Irwin v. The State, 43 Texas, 236; Lynch v. The State, 24 Texas Ct. App., 350; Brooks v. The State, Id., 274; Willson's Crim. Stats., sec. 1053.)

We are of opinion, for the reasons above given, that the court did not err in declining to submit in the charge to the jury the issue of manslaughter as an issue in this case. And for the reasons above given, we are further of opinion that the court did not err in refusing to give the following special requested instruction asked in behalf of defendant, viz: "If you believe from the evidence that the defendant and the deceased, either in person or by parties representing them, made an agreement, the object of which was to prevent further hostilities and to preserve the peace, and that they agreed on certain conditions which were to be observed by both parties, the

violation of which was to nullify the agreement and give no-
tice that it was terminated, and if you further believe that
after such agreement was made, if any ever was, that the de-
deceased, Allchin, in violation of his agreement, if any, did
any act or acts in violation thereof, and that the defendant
knew, or heard, of the same, and honestly believed that the
same was a declaration of hostility, and that he was in danger
of death or serious bodily harm; and if you further believe
that, after the agreement, if any, was broken by the deceased,
the defendant saw deceased in the act of violating his agree-
ment, and that so seeing him, defendant believed himself in
immediate danger of death or serious bodily harm, then defend-
ant had a right to act on the appearances of danger to himself,
if any, and though defendant may have been mistaken in his
belief of immediate danger of death or bodily harm, yet if he
honestly believed, and had reason to believe, that he was in
such danger, and honestly acting on such appearances he killed
Allchin, he would be guilty of no offense, and you will find
him not guilty."

"If the jury believe from the evidence that there was a con-
tract between the deceased and the defendants, by the terms of
which he was not to carry his Winchester in his hands, or
otherwise than attached to his saddle in a scabbard, or in his
buggy, and if they further believe that the said contract was
made, and that deceased failed to conform to the same, and
that complaint was made to the parties negotiating between
the deceased and the defendants concerning such contract and
breach thereof, and that said parties notified the deceased that
again to carry his weapon in a manner not provided in said
contract would be regarded as a breach thereof and a hostile
demonstration, but that such was the understanding between
the parties; and if the jury believe that at the time of the kill-
ing the deceased with such knowledge on his part, and the de-
fendants with such understanding on their part, found the de-
ceased carrying his weapon in an attitude which was in viola-
tion of the contract, what the parties regarded as a hostile
demonstration, and came suddenly upon him, and thereupon
shot and killed the deceased, then the defendants are not, in
law, guilty, and you will acquit by your verdict."

The charge of the court on self defense was, in our opinion,
sufficient and pertinent to the facts in evidence, if, indeed, the
issue of self defense could in any manner be said to have been

legitimately raised by the facts. (Willson's Crim. Stats., secs. 969, 970, 978.) The evidence totally fails to show any real or apparent danger at the time appellant and Springfield opened fire on Allchin. He was sitting on his horse, with his back to them, his gun across his lap, talking to some party or parties on the sidewalk; he did not and could not have seen them, and if he grasped his gun at all it was after the appearance of appellant and Springfied upon the sidewalk, with their guns, had occasioned some one to exclaim "look out;" and then, before he could have raised his gun from his lap he was fired upon by these parties. and his gun was never in a condition to be used upon them after they commenced the attack.

Upon "reasonable doubt" the court instructed the jury that "the defendant is presumed to be innocent until his guilt is established by the evidence to the satisfaction of the jury beyond a reasonable doubt." This was specially excepted to because of the omission of the word "legal," as used in the statute before the word "evidence." (Code Crim. Proc., art. 727.) Whilst it has been uniformly held and recommended by the court that reasonable doubt should be charged in the exact language of the statute (Bramlette v. The State, 21 Texas Ct. App., 611), we have never held that a substantial compliance with the terms of the statute was not sufficient. (Willson's Crim. Stats., 2426, 2427, 1071.) It is not perceived how the omission of the word "legal" before the word "evidence" could in any manner have misled the jury, or have proved prejudicial in any manner to the rights of the accused.

In the seventh assignment of error it is complained that "the court failed to instruct the jury that the declaration of Allchin to Felker that threats had been made against him by defendant was not any evidence that such threats *were made*, and that they should not consider such statement as a part of the evidence for that purpose, when it was expressly requested so to charge by defendant." This evidence was drawn out by defendant upon the direct examination of his witness Felker, and neither the prosecution nor the court was responsible for it. If the defendant elicits testimony adverse to himself he must abide the consequences. (Speight v. The State, 1 Texas Ct. App., 551; Moore v. The State, 6 Id., 562.)

One of the grounds of motion for new trial was that the verdict of the jury was arrived at by unfair and illegal means, and was in fact decided by lot or means equivalent thereto. A juror

44

made affidavit to this effect. But in addition to the fact that no complaint or objection was heard from him when the jury was polled after the verdict was returned into court, he is flatly and positively contradicted upon the point relied upon, by the affidavits of ten of his fellow-jurors filed by the State in answer to this ground of the motion. It was not error to overrule the motion based upon this objection to the verdict.

We have examined and discussed all the grounds mainly relied upon by able counsel for appellant, and besides have read re-read and maturely considered this voluminous record with a view of seeing whether in the conduct of the trial any proceedings were allowed likely to impair the fairness and impartiality of the trial, and impeach the legality of the conviction; and we are constrained to say we have found none. The trial has been fair and impartial so far as we have been able to judge of it from the record, and, considered in the light of the record, we think appellant has every reason to congratulate himself upon the mildness of the punishment awarded him. The judgment is affirmed.

*Affirmed.*